UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **Vinay K. Karna**, | § § § | Civil Action No. 3:24-cv-00231 |
| Plaintiff, | § § § | |
| v. | § § | **AMENDED COMPLAINT** |
| **Truist Bank,** | § § § | |
| Defendant. | § § § | |

COMES NOW the Plaintiff, Vinay Karna (hereinafter "Plaintiff"), and for his Amended Complaint against the Defendant, Truist Bank (hereinafter "Defendant"), states as follows:

## INTRODUCTION

1. Plaintiff brings this Complaint for damages against Defendant for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. (hereinafter "FCRA"), which prohibits unfair and inaccurate credit reporting methods.

## JURISDICTION

2. Jurisdiction of this Court is proper pursuant to 15 U.S.C. § 1681 *et seq.* and 28 U.S.C. § 1331.

1

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendant transacts substantial business in this District.

## PARTIES

4. Plaintiff is a natural person who resides in the city of Pearland, county of Brazoria, state of Texas, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

5. Defendant is a national bank that is licensed to do business in the State of Texas and regularly conducts business in said State. Defendant has a principal place of business located at 214 North Tryon St, Charlotte, NC 28202. Defendant has an agent of service of Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608. Defendant is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

6. Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

7. Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the

efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

8. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

9. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

10. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

11. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

12. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation,

personal characteristics, or mode of living" is collected. Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

13. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

14. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C.

15. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, and 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

16. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

17. Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

18. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry-wide as the CDIA's "Credit Reporting Resource Guide."

19. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

20. Metro II codes are used in an industry-wide form known within the credit industry as an Automated Credit Dispute Verification ("ACDV") electronic form.

21. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

22. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

## FACTUAL ALLEGATIONS

23. On July 3, 2018, Plaintiff incurred a financial obligation with Defendant. Specifically, Plaintiff obtained a $24,000 auto loan refinance with Defendant bearing partial account number LS4516XXXX.

24. Plaintiff's loan with Defendant required monthly $439.19 payments.

25. For the first seventeen months of the loan (August 2018 through December 2019), Plaintiff made timely monthly payments totaling $7,466.23.

26. In January 2020, the beginning of the COVID-19 pandemic, Plaintiff lost his job and was forced to seek new employment with a much lower salary.

27. As a result, Plaintiff could not make monthly payments on the loan moving forward. December 2019 was the last payment Plaintiff made on the loan.

28. On May 19, 2020, Defendant charged off the account with an outstanding balance of $17,968.48.

29. Consequently, sometime after May 19, 2020, Defendant hired Associated Credit Services, Inc ("ACS") to collect the outstanding debt on behalf of Defendant.

30. Around the same time, Plaintiff hired Applawd Legal Services, APC ("Applawd") to assist him in managing and paying off his debt owed to Defendant.

31. On June 2, 2020, ACS sent Plaintiff a letter stating:

> "Dear Vinay Karna, as authorized agents for Truist Bank, Associated Credit Services, Inc. will accept the amount of $5,309.00 as full and final payment on the above referenced account."

32. The June 2, 2020, letter went on to set a payment schedule as follows:

    - $885.00 on June 29, 2020
    - $885.00 on July 29, 2020
    - $885.00 on August 29, 2020
    - $885.00 on September 29, 2020
    - $885.00 on October 29, 2020
    - $885.00 on November 29, 2020

33. Plaintiff, through Applawd, made all the above payments on time.

34. On December 10, 2020, ACS sent Plaintiff another letter stating:

    "Dear Vinay Karna, as authorized agents for Truist Bank, Associated Credit Services, Inc. will accept the amount of $5,309.00 as full and final payment on the above referenced account.

    Payment of $5,309.00 was received on November 30, 2020. Upon clearance of that payment, your account will be settled in full."

35. The plaintiff's November 30, 2020, payment, made through Applawd, was cleared, and the account was fully settled.

36. In October 2022, Plaintiff pulled his credit report through Experian Information Solutions, Inc. ("Experian") and discovered that it inaccurately reported his tradeline with Defendant as charged off with an outstanding balance of $12,386.

37. On or about October 28, 2022, Plaintiff submitted an online dispute with Experian, pursuant to 15 U.S.C. § 1681i, stating that Plaintiff's tradeline with Defendant was

7

reporting inaccurately and that the account had been settled in full and should be reporting a zero balance.

38. Experian then communicated Plaintiff's dispute to Defendant in automated consumer dispute verification ("ACDV") forms pursuant to 15 U.S.C. § 1681i(a)(2).

39. In response, Defendant erroneously responded and verified to Experian that Plaintiff's account had an outstanding balance of $12,386.

40. Defendant failed to conduct a reasonable investigation into Plaintiff's dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account information, in the alternative, failed to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to Experian that Plaintiff's account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

41. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration; anxiety, the weakening and diminishment of his credit profile, credit worthiness, and credit score, denial of credit applications, and obtaining credit with significantly less favorable interest rates; as a direct and proximate result of Defendant's violations of the Fair Credit Reporting Act as described above.

## TRIAL BY JURY

42. Plaintiff is entitled to, and hereby demands, a trial by jury. U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## **CAUSES OF ACTION**

### **COUNT I.**

### **VIOLATIONS OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. § 1681** *et seq.*

43. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

44. Defendant violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information and failing to update and/or remove the inaccurate account status or, in the alternative, to report the account as "disputed" by changing the Metro II CCC to "XB."

45. As a result of Defendant's violations of the FCRA, Plaintiff has suffered actual damages including, but not limited to, out-of-pocket expenses, detriment to his credit rating, emotional distress, embarrassment, mental anguish, anxiety, and humiliation, in an amount to be determined at trial.

46. Defendant's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n.

47. Alternatively, Defendant's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

48. Plaintiff is entitled to recover actual damages, statutory and punitive damages, and costs and attorney's fees from Defendant in an amount to be determined by the Court, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant for:

- an award of actual damages caused by Defendant's violations of the FCRA, pursuant to 15 U.S.C. § 1681n and 1681o;
- an award of punitive damages against Defendant for its willful noncompliance with the FCRA, pursuant to 15 U.S.C. 1681n;
- an award of costs and attorney's fees against Defendant, pursuant to 15 U.S.C. §§ 1681n and 1681o; and
- such other and further relief as the Court may deem just and proper.

Dated this 22nd day of November 2024.

Respectfully submitted,

By: *s/Kevin D. Green*
Kevin D. Green
*Attorney-in-Charge*
Texas Bar No.: 00792544
S.D. Tex. I.D. No.: 3737219
**LAW OFFICE OF KEVIN D. GREEN**
7960 Mesa Trails Cir.
Austin, TX 78731
Telephone: (512) 695-3613
kevin@consumerjusticecenter.com

Carter B. Lyons, Esq.
MN Attorney I.D. #: 403655
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone:  (651) 770-9707
Facsimile:   (651) 704-0907
carter@consumerjusticecenter.com
(*Admitted Pro Hac Vice*)

***ATTORNEYS FOR PLAINTIFF***